[No. B078417. Second Dist., Div. Two. Aug. 25, 1994.]

GREGORY Q. BROWNE et al., Plaintiffs and Respondents, v.
NANCY RUSSELL, as City Clerk, etc., Defendant and Appellant;
AMERICANS FOR NONSMOKERS' RIGHTS et al., Interveners and
Appellants.

## COUNSEL

James K. Hahn, City Attorney, Claudia McGee Henry and Anthony Saul Alperin, Assistant City Attorneys, Patricia V. Tubert and Kenneth Cirlin, Deputy City Attorneys, for Defendant and Appellant.

Roger Jon Diamond, Marilyn Jenett, Strumwasser & Woocher, Fredric D. Woocher, Michael J. Strumwasser and Susan L. Durbin for Interveners and Appellants.

Munger, Tolles & Olson, Mark H. Epstein, Reed & Davidson, Dana W. Reed, Darryl R. Wold and Bradley W. Hertz for Plaintiffs and Respondents.

## OPINION

**NOTT, J.**—Appellants Nancy Russell, City Clerk of the City of Los Angeles (the Clerk), and Americans for Nonsmokers' Rights, American Lung Association of Los Angeles County, Inc., and Marilyn Jennett (interveners) appeal from a writ of mandate issued in favor of respondents Gregory Q. Browne, Fredric A. Shinerock and Maurice Prince. In its order, the superior court declared unconstitutional section 339 of the City of Los Angeles Election Code.

The question presented is whether, as applied, an ordinance requiring that circulators of referendary petitions be residents and registered voters of a charter city violates respondents' free speech or the right to challenge local government through referendum. We hold that it does not and reverse the order of the superior court.

## BACKGROUND

On June 25, 1993, the City of Los Angeles (City) published an ordinance prohibiting smoking in restaurants (the ordinance). The Los Angeles Hospitality Coalition, which describes itself as "including restaurants, hotels, motels, tobacco manufacturers, beverage manufacturers, food companies, night clubs and many other concerned citizens," sought to block enforcement of the ordinance.[1] The coalition hired American Petition Consultants, a firm in the business of qualifying initiatives and referenda for the ballot, to qualify a referendum seeking to repeal the ordinance. Respondents timely circulated and submitted a referendary petition, which had the effect of staying the ordinance pending verification of the petition signatures by the Clerk.

Under the City Charter, a referendary petition must have qualified signatures equal to at least 10 percent of the number of people voting in the last mayoral election. (L.A. Charter, § 282.) The verification process requires that the Clerk count a 5 percent sample of the signatures. (L.A. Charter, § 273, subd. (c).) If that sample projects that the petition will have less than 90 percent of the signatures needed, the petition is insufficient and the ordinance goes into effect. (§ 282.) If the sample projects that the petition will have more than 110 percent of the required signatures, the petition is deemed sufficient and the city council must either rescind the ordinance or put it to a vote. The ordinance does not go into effect unless the voters approve it. (*Ibid.*) If the sample projects that the petition will have between 90 and 110 percent of the signatures, the Clerk reviews the entire petition to make a determination of sufficiency. (§ 273, subd. (c).)

In this case, the ordinance took effect after the Clerk conducted a sample count, projected that the petition would not have the required qualified

---

[1]Respondents Browne and Shinerock are sponsors of the referendum. Respondent Prince owns a restaurant in the City. The referendum was financed by monetary contributions of $211,144. The referendum's financial contributors included the following out-of-state corporations: From Illinois, Kraft General Foods ($10,000); from New York City, Lorillard Tobacco Co. ($16,716) and Phillip Morris, U.S.A. ($77,622); from Milwaukee, Wisconsin, Miller Brewing Co. ($10,000); from Winston-Salem, North Carolina, R.J. Reynolds Tobacco Co. ($76,279.19); and from Stamford, Connecticut, the American Tobacco Co. ($15,578). These corporate contributions totalled $206,195.

signatures, and issued a certificate of insufficiency. The Clerk rejected 1,111 signatures upon determining that the persons who circulated certain portions of the petition were not City residents and registered voters. City Election Code section 339 (section 339) requires that signatures gathered by one who is not a resident and registered voter within the City "shall not be counted."[2]

Respondents filed a petition for writ of mandate in the superior court. Following a hearing on August 26, 1993, the superior court declared that as applied, section 339 violated the right of free speech (Cal. Const., art. I, § 2) and the right of referendum (Cal. Const., art. IV, § 1). The court denied the request to stay the implementation of the ordinance, but ordered the City to count the signatures and determine whether the referendum otherwise qualified. The minute order stated that the court applied the strict scrutiny test, citing *Eu v. San Francisco Democratic Comm.* (1989) 489 U.S. 214 [103 L.Ed.2d 271, 109 S.Ct. 1013] and *Meyer v. Grant* (1988) 486 U.S. 414 [100 L.Ed.2d 425, 108 S.Ct. 1886].

On September 2, the Clerk filed a return in the superior court stating that of the 1,111 signatures that the court ordered counted, 623 were qualified. A declaration attached to the return informed the court that if those signatures were considered, the Clerk projected that the petition would have between 90 and 110 percent of the necessary signatures.

On September 3, the court issued a writ of mandate, ordering the Clerk to examine all the signatures to determine the number of qualified registered voters. The court ordered that no signatures were to be disqualified on the basis of section 339. The Clerk was to file a return by October 4, 1993.

On September 21, this court granted appellants a writ of supersedeas, staying the writ of mandate issued by the superior court on September 3 and all further proceedings pending the outcome of this appeal.

DISCUSSION

A. *Mootness*

A week before oral argument in this case, the Governor signed into law Assembly Bill No. 13, prohibiting smoking in restaurants throughout the state. The parties subsequently filed a joint stipulation of dismissal on the grounds that (1) the state law substantially overlaps the City ordinance that

---

[2]"Circulators of petitions shall be residents and qualified, registered voters of the City of Los Angeles. . . . Unless circulators are so registered the petitions circulated by them shall not be valid and signatures thereto shall not be counted." (§ 339.)

was the subject of the referendum petition at issue in this case, (2) respondents have no further interest in pursuing the referendum or seeking to require the Clerk to certify the petition, and (3) therefore, the appeal is moot.

■ Though these circumstances render moot the controversy between the parties in this action, it does not resolve the free speech issues that are raised in the case. It is our opinion that in the future American Petition Consultants or a similar company will again be engaged to qualify initiatives or referenda in the City, and that there is every possibility that the issues raised and fully briefed by the parties in this matter will arise again. Therefore, we exercise our discretion to resolve issues of continuing public interest and decide the merits of this case. (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 140-141 [137 Cal.Rptr. 14, 560 P.2d 1193]; *County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555]; *Mann* v. *Superior Court* (1986) 181 Cal.App.3d 372, 374-375 [226 Cal.Rptr. 263].)

B. *Respondents' Right of Political Expression*

1. *Standard of Review*

■ "The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.' " (*Meyer* v. *Grant, supra,* 486 U.S. 414, 421-422 [100 L.Ed.2d 425, 434-435], fns. omitted.) The same can be said for the circulation of a referendum petition. Therefore, the question presented is whether the City Election Code requirements impermissibly or unacceptably burdened respondents' right of political expression in this case. (*Id.* at p. 424 [100 L.Ed.2d at pp. 436-437]; *Buckley* v. *Valeo* (1976) 424 U.S. 1, 44-45 [46 L.Ed.2d 659, 702-703, 96 S.Ct. 612].) If section 339 severely restricts respondents' rights, it can survive constitutional scrutiny only if the government shows that it advances a compelling state interest and is narrowly tailored to serve that interest. (*Eu* v. *San Francisco Democratic Comm.,*

*supra*, 489 U.S. at p. 222 [103 L.Ed.2d at p. 281]; *Buckley* v. *Valeo, supra*, 424 U.S. at pp. 47-48 [46 L.Ed.2d at pp. 703-704].)[3]

### 2. *The Requirement That Circulators Be Registered Voters of the City Did Not Unduly Burden Respondents' Right of Political Expression*

■ Respondents argue that the residence and registration requirements of section 339 impose a substantial burden on their free speech rights. Relying on a declaration submitted by the owner of American Petition Consultants, they contend that the facts establish that they attempted to comply with the requirements. According to the declaration, the company hired supervisors to oversee the collection of signatures; the supervisors were instructed to require each circulator to present either a registration stub or proof of City residency and assurance that he or she was a registered voter; and if the circulator was able to prove residency but not registration, the company's "practice was to require that person to register to vote prior to circulating the Referendum Petition." Respondents urge that petition sponsors could not reasonably be asked to do more, and yet "a dispositive number of circulators were not City registered voters," which caused the petition to fail. Thus, they maintain, the only inference to be drawn from these facts is that section 339 imposed a substantial burden on respondents' rights.

The declaration falls short of respondents' assertions. It does not establish that in this case any supervisor actually complied with the instructions of the company or, if they did, that any of the circulators complied with the instructions. In fact, there is no support for the claim that respondents did all they could have done. With respect to requiring unregistered potential circulators to register, the declaration is a statement of company policy and no more. Even though the company had such a policy, it apparently had no method for verifying whether its supervisory employees were enforcing the

---

[3]The superior court found a violation of respondents' right of free speech under the state Constitution, though it cited United States Supreme Court cases for the strict scrutiny standard of review. The parties mainly rely on United States Supreme Court cases in the free speech analyses presented in the briefs. It has been stated in California Supreme Court cases involving free speech, though not necessarily political speech, that the protections offered by our state Constitution are even broader than those provided by the First Amendment. (See, e.g., *Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177], cert. den. (1988) 485 U.S. 934 [99 L.Ed.2d 268, 108 S.Ct. 1107]; *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908-909 [153 Cal.Rptr. 854, 592 P.2d 341], affd. by *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]; but see *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 745-746 [257 Cal.Rptr. 708, 771 P.2d 406].) Even if that is true in the context of political speech, as California has not developed a more stringent standard than the strict scrutiny of the United States Supreme Court in political speech cases, we apply that standard here.

policy and unregistered persons were in fact registering before being hired as circulators. Nor would verification be as difficult or time-consuming as respondents imply. As the interveners suggest, a circulator unable to establish his or her status could have filled out a voter registration form. The forms could have been copied and the original mailed or hand-delivered to the registrar. That would have eliminated all questions regarding registration.[4]

Respondents rely heavily on *Meyer* v. *Grant*, *supra*, 486 U.S. 414. *Meyer* involved a Colorado statute requiring petition circulators to be volunteers and making it a felony for initiative proponents to pay circulators. The Supreme Court agreed with the Court of Appeals' conclusion that the record demonstrated that the available pool of circulators was "necessarily smaller if only volunteers can be used." (*Id.* at p. 419 [100 L.Ed.2d at p. 433].) The high court also found that the absolute ban on compensation of circulators "limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach." (*Id.* at pp. 422-423 [100 L.Ed.2d at pp. 435-436], fn. omitted.) In making that determination, the court relied on testimony in the record that more people are able and willing to circulate petitions if they are compensated. (*Id.* at p. 423, fn. 6 [100 L.Ed.2d at pp. 435-436].)

The case before us is decidedly different. Respondents do not argue and have not shown that people who live and vote outside the City were more willing to circulate their petitions than those who live and vote within the City. A declaration submitted by the Clerk reveals that 1,300,000 registered voters lived in Los Angeles in June 1993 and that another 1,000,000 were eligible to vote but not registered. Nevertheless, respondents' supporting documentation does not establish that they tried but were unable to find circulators among those 2,300,000 members of the City's population. Rather, the document shows only that American Petition Consultants knew of the registration requirement and had a policy for compliance.

Respondents also argue that section 339 burdens those who live outside the City and wish to circulate a petition. Their reliance on *Meyer* in this context is misplaced. They contend that section 339 is more restrictive than

---

[4]A portion of the declaration not relied on in the brief states that the company was unable to verify the voter status of many of the circulators because the registrar's office moved from the City of Commerce to Norwalk during the 30-day qualifying period allowed for the petition, and the office was therefore closed for part of the time and not fully set up when moved to its new location. The declaration goes on to say that the registrar did not permit over-the-phone precinct verification which would have enabled the company to verify the status of the circulators. As noted above, however, the company did not have to try to verify through the office of the registrar.

the *Meyer* statute because the former "absolutely prohibits those living outside the City from circulating, whereas in *Meyer* the particular restriction there at issue allowed anyone to circulate a petition so long as they were not paid." That is not entirely accurate. The *Meyer* court noted that the Colorado Constitution requires that persons who circulate petitions be registered voters. (486 U.S. at p. 417 [100 L.Ed.2d at. p. 432.) The registration requirement was not at issue in the case, but *Meyer* does not stand for the proposition for which respondents cite it. Respondents have no other authority for their position that the City has a duty to offer nonresidents the opportunity to circulate petitions which concern a City ordinance. Rather, under the authorities they cite, the question is whether the residency and registration requirements limited the opportunity of City residents and voters to hear about and discuss respondents' petition, and respondents have not shown that to be the case.

We therefore hold that respondents have not established that section 339 restricted their right of political expression. Moreover, we hold that the City has compelling interests which are protected by section 339. The electorate of this state adopted the initiative and referendum methods to have access to and control of a legislative process because it believed that the process could otherwise be dominated by special interests. *(Citizens Against Rent Control v. City of Berkeley* (1980) 27 Cal.3d 819, 825 [167 Cal.Rptr. 84, 614 P.2d 742], reviewed on other grounds *sub nom. Citizens Against Rent Control v. Berkeley* (1981) 454 U.S. 290 [70 L.Ed.2d 492, 102 S.Ct. 434].) "[T]he initiative and referendum processes can themselves be employed by the special interest groups whose power they were designed to curb." *(Citizens Against Rent Control v. City of Berkeley, supra,* 27 Cal.3d at p. 826.) We can think of no better way to preserve the integrity of the referendum process as it relates to local ordinances than to require that only those eligible to vote for the members of the body which passed the ordinance be able to engage in the "core political speech" of attempting to gather signatures to challenge the ordinance. *(Meyer v. Grant, supra,* 486 U.S. at p. 422 [100 L.Ed.2d at p. 435]; see *Lawing v. Faull* (1964) 227 Cal.App.2d 23, 29 [38 Cal.Rptr. 417].)[5] Having given section 339 the strict scrutiny required, we conclude that the trial court erred in granting respondents' petition for a writ of mandate.

---

[5]The interveners make an additional argument: The nonresident, nonregistered circulators swore under penalty of perjury that they were registered voters of the City. Thus, the interveners contend, the superior court erred in ordering the Clerk to count the signatures gathered by those circulators. Though the interveners placed the issue before the superior court, it was not the basis of the court's ruling. In light of that and in light of our reversal of the superior court's order, we need not review this question for error.

### C. *Respondents' Referendary Powers Were Not Violated by the Clerk's Application of Section 339*

■ Charter cities may provide for the exercise of the power of referendum in any manner that does not impinge on the basic right of referendum expressed in the Constitution. (*Atlas Hotels, Inc.* v. *Acker* (1964) 230 Cal.App.2d 658, 660-661 [41 Cal.Rptr. 231], referring to Cal. Const., art. XI, § 5.)

■ Respondents contend that their referendary rights were violated when the Clerk invalidated a number of signatures due to the failure of the circulators to comply with the requirements of section 339. They argue that the Clerk had the obligation to verify the signatures on the petition and count the valid ones, despite the finding that the circulators of those petitions did not comply with section 339. Respondents rely on *Truman* v. *Royer* (1961) 189 Cal.App.2d 240 [11 Cal.Rptr. 159] to support their position.

In *Truman*, a referendum petition was deemed insufficient after the clerk determined, among other things, that in violation of the state Elections Code, the circulators' affidavits failed to state that they were voters of the city, and that a certain percentage of the 2,627 petition signers were neither voters nor residents of the city. After the filing of a petition for writs of mandate challenging the clerk's actions, the clerk certified the petition as sufficient. The clerk informed the court that he had in fact checked the signatures and found the petition was signed by a sufficient number of registered voters. Upon a challenge to that action, the Court of Appeal upheld the checking of the signatures despite the failure of the circulators to comply with the Elections Code. The court held that requirements of law such as those found in the Elections Code were "mandatory upon petitioners," though they are for the benefit and convenience of the clerk. Therefore, if the clerk chooses to check and finds the signers qualified, the petition must be certified sufficient. (*Truman* v. *Royer, supra*, 189 Cal.App.2d at pp. 243-244.)

*Truman* did not invalidate the voter residency and registration requirements for circulators. Rather than finding the requirements impinged on referendary rights, the court found that circulators of referendary petitions must comply with the requirements. Moreover, *Truman* does not require clerks to examine petition signatures where circulators fail to comply with the law. Indeed, the court held that a clerk may refuse to certify petitions because of noncompliance with such provisions. (*Truman* v. *Royer, supra*, 189 Cal.App.2d at p. 243.) Further, *Truman* holds that if the clerk chooses to forego the benefit and convenience provided by laws such as that found in the Elections Code, examines the petitions and finds an ample number of

qualified signatures, the clerk is "duty bound to certify the petition as sufficient." (*Id.* at p. 244.) We note that in *Truman*, the clerk only had to find 153 qualified signatures among the 670 that were previously disqualified in order to certify the petition.

In this case, the Clerk did not decide to investigate the validity of the 1,111 signatures that were presented by the unregistered circulators to determine if there were 623 qualified signatures among them. Neither *Truman* nor any other case cited by respondents requires that the Clerk should have done so. It was incumbent upon respondents to comply with section 339, the requirements of which they concede they knew. The Clerk was under no obligation to save their petition from the effects of their failure to so comply.

Respondents argue that before nullifying the exercise of a constitutionally reserved power by the signer, the defect in the circulator affidavit must be a meaningful one. *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 652 [180 Cal.Rptr. 297, 639 P.2d 939] certiorari denied (1982) 456 U.S. 491 [72 L.Ed.2d 463, 102 S.Ct. 2003], cited by respondents, supports our view. The court stated that "technical deficiencies in referendum and initiative petitions will not invalidate the petitions if they are in 'substantial compliance' with statutory and constitutional requirements." The circulators were not in substantial compliance with the City's requirements for referendum circulators. Nor does this case involve a technical defect in the affidavit, such as the one asserted in *Assembly* v. *Deukmejian*, or the one found in footnote 6 of *Nelson* v. *Carlson* (1993) 17 Cal.App.4th 732, 741 [21 Cal.Rptr.2d 485] review denied, also cited by respondents. Further, as noted earlier in the opinion, section 339 does have meaning: by requiring that circulators be City residents and voters, the City is seeking to preserve the integrity of the referendum process.

### DISPOSITION

The judgment is reversed with directions to enter judgment denying the petition for writ of mandate. As the parties have entered into a joint stipulation of dismissal, we need not award costs.

Gates, Acting P. J., and Fukuto, J., concurred.

A petition for a rehearing was denied September 20, 1994, and the opinion was modified to read as printed above.